[No. 17805. Department Two. September 10, 1923.]

CHARLES W. REED et al., Respondents, v. GREAT NORTHERN RAILWAY COMPANY, Appellant, ST. PAUL MINNEAPOLIS & MANITOBA RAILWAY COMPANY, et al., Defendants.[1]

PUBLIC LANDS (13, 17)—ENTRIES—RIGHTS ACQUIRED BY OCCUPANCY—HOMESTEAD ENTRY—UNSURVEYED LANDS. The essential initiatory acts required by the homestead law need not be identical with actual residence, where the land is unsurveyed; hence a railroad company cannot claim lieu lands and truthfully assert that "no adverse right or claim" has attached, where a settler has posted notices and is engaged in cutting trails, building a cabin, and the like; and if it does so, its selection is ineffectual for any purpose.

Appeal from a judgment of the superior court for Whatcom county, Hardin, J., entered June 21, 1922, upon findings in favor of the plaintiffs, in an action to declare a trust and quiet title, tried to the court. Affirmed.

[1]Reported in 218 Pac. 210.

*Thomas Balmer* and *Edwin C. Matthias,* for appellant.

*Walter B. Whitcomb* and *F. M. Hamilton,* for respondents.

TOLMAN, J.—Respondents, as plaintiffs, sought by this action to have the defendants declared to be trustees holding the legal title to a certain forty-acre tract of land in Whatcom county for their use and benefit; to enforce conveyance of the legal title to them; and to have their title quieted as against the claims of the defendants. The defendant St. Paul, Minneapolis & Manitoba Railway Company was not served with process, and did not appear. The defendant Director General of Railroads filed a disclaimer; and the defendant Great Northern Railway Company filed an answer and cross-complaint alleging title in it. A trial upon the merits upon the issues thus raised resulted in a decree awarding to plaintiffs the relief sought, from which decree the defendant Great Northern Railway Company has appealed.

The facts are not greatly in dispute, so far as material to our present inquiry, and are shown to be substantially as follows: In September or October, 1901, one W. J. Tincker, being duly qualified to enter land under the homestead laws, went upon the northwest quarter of Section 3, Township 39, North, Range 6 E., W. M., blazed a line around the same, posted notices on the four corners, and claimed the quarter section of land described as his homestead, it being then unsurveyed, vacant government land. He spent but a few hours on the land at that time, and did not go upon it again until some time between February and May, 1902. At that time he blazed a trail from the Nooksack river to the northwest corner of his claim, laid some poles or logs as a foundation for a cabin, which he did

not complete; and from 1902 to 1906, Tincker was on his claim on an average of once or twice a year, usually while on a hunting trip, and at these times he renewed his posted notices.

During all of this period, Tincker was a married man, living with his wife and family at Maple Falls, and there maintaining a home. He did no other work on the land, and neither he nor any member of his family ever actually resided upon or cultivated the land. In August, 1906, Tincker sold his rights and relinquished his claim in consideration of $25 to one W. M. Smithey, who immediately removed Tincker's notices and posted his own in lieu thereof, claiming not the identical quarter section claimed by Tincker, but four forty-acre subdivisions, described as the west half of the west half of the section, including, as did the Tincker claim, the southwest quarter of the northwest quarter, which is the subject of this action.

Smithey blazed a trail from the north line of the section to a point on the forty acres here in dispute, where he cleared an area about one hundred feet square, and at that place he sawed a cedar tree into sections for shakes to build a house, but the shakes were never split, and the house was never built. Smithey was on the land engaged in this work some five days at that time, continued to claim the land from August to November, 1906, and spent a day or so each week during that interval in swamping out trees and blazing trails. During this time, Smithey resided with his wife and family at Maple Falls, and neither he nor any member of his family took up actual residence on the land.

On November 24, 1906, Smithey sold his claim and executed a relinquishment to Charles W. Reed, one of the plaintiffs, for a consideration of $50. Immediately upon purchasing the claim, Reed removed Smithey's

notices and posted his own, claiming the west half of
the west half of the section, as Smithey had done. He
immediately began clearing and the construction of a
cabin on the forty acres lying immediately north of
the land in controversy, packed in supplies and prose-
cuted the work diligently, and as soon as he had pro-
vided a suitable shelter for his family, and about
March 1, 1907, he moved his family to the cabin and
has continuously resided there since that time.

At the time of the trial below, respondents' improve-
ments consisted of a house, woodshed, root house, tool
house, barn, an acre or so in cultivation and several
acres slashed, all on the forty acres lying immediately
north of the one in question. In addition, good trails
had been constructed, one of which was across the forty
acres here involved, and the area originally cleared by
Smithey on the tract in dispute had been planted to
berries.

On May 5, 1902, the St. Paul, Minneapolis & Mani-
toba Railway Company filed a selection list in the
United States Land Office at Seattle, under the Act of
August, 5, 1892, entitled "An Act for the relief of
settlers upon certain lands in the States of North
Dakota and South Dakota," in and by which the forty
acres in controversy was selected and claimed; and on
June 21, 1902, filed a supplemental or amended list
describing the same land, each of which was supported
by an affidavit on behalf of the railway company to the
effect that the lands included in the list were vacant
and unappropriated, not mineral or reserved lands,
and of the character contemplated by the act of Con-
gress above referred to. It will be seen that, prior to
the filing of either the original or amended list, Tincker
had undertaken to initiate his claim by blazing the
lines, posting notices, and doing a small amount of
other work as hereinbefore indicated.

A plat of the survey of the township in which the land lies was filed with the local land office on February 6, 1907; and on that day Charles W. Reed, the respondent, also filed with the local land office his application to enter the west half of the west half of the section, including this forty acres, as a homestead. His application was received by the land office officials without objection, and he was not then informed by the officials, or from any other source, that the land had been selected by the railway company, and apparently he had no notice or knowledge of any such selection at that time, or at any time until December 1, 1909.

About March 11, 1907, the officials of the local land office transmitted to the general land office the supplemental list filed by the railway company February 23, 1907, after the plat of survey had been filed, with a certificate in which they certify, in effect, that there was no prior homestead or other valid claim to any portion of the lands selected, on file or of record in the local land office. The certificate failed to show the homestead entry by respondent Reed, which was then on file, and it is claimed that this certificate was false and fraudulent as to respondents, in that, without notice to respondents or any opportunity to be heard, the local land office officials thereby adjudicated that respondents' claim was not prior to that of the railway company.

Thereafter, still without notice to respondents, patent dated April 13, 1908, was issued to the railway company for the land in question. On December 1, 1909, respondent Charles W. Reed appeared before the local land office for the purpose of making final proof upon his homestead entry, and was then informed, as it appears, for the first time, that this forty-acre tract had been selected by the railway company, and a patent issued to it therefor. Various efforts were made to

have the matter re-opened and a hearing accorded by the land department, all without success, and finally respondents resorted to this action for relief. The judgment below, from which this appeal is prosecuted, granted the relief prayed for.

Many points are presented and argued here, but because of the involved nature of the case, and the inevitable length of this opinion, our discussion will be confined to the points we find to be controlling.

The act of Congress under which the railway company selected this land, after providing for the relinquishment of lands claimed by settlers located within a prior grant, permits a railway company to select,

" . . . . an equal quantity of non-mineral public lands, so classified as non-mineral at the time of actual government survey which has been or shall be made, of the United States not reserved and to which no adverse right or claim shall have attached or have been initiated at the time of the making of such selection, lying within any state in which or through which the railway owned by said railway company runs, to the extent of the lands so relinquished and released."

Since it must be conceded that the acts of Tincker and Smithey were not sufficient to initiate a bona fide settlement under the homestead law, the question immediately presented is, were such acts sufficient to initiate a valid claim to vacant and unsurveyed government lands; and if not, under the terms of the act above quoted, was the initiation of the claim, invalid at the time of the railway company's selection, but, which might become valid by the subsequent acts of the claimant, sufficient to prevent the rights of the railway company from attaching?

The right of one seeking to obtain title by compliance with the homestead law to initiate a valid claim to unsurveyed lands has long been recognized. In the statutes, official circulars, and decisions of the courts,

various terms are used to describe the acts essential to initiate—such as "occupancy," "placing improvements upon the land or establishing residence thereon," "settlement," and the like; but no authority is called to our attention which squarely holds that the initiatory act must be identical with the actual residence required by the homestead law. The conditions are so different that it would seem that the same rule could not apply. When the land has been surveyed and is open to immediate entry, the settler has a certainty of obtaining title to that which he selects, and a failure to take up actual residence on the land shows a lack of good faith. In the case of unsurveyed lands, there is no certainty as to when an actual entry can be made, nor as to where the lines, when surveyed, will run, and one might, at considerable labor and expense, erect a dwelling for his family and provide other necessities and improvements vitally essential to actual residence, only to find when the survey was made that his improvements were without the lines of the particular tract which he claimed and desired to enter. For these and many other obvious reasons, it would seem that the rule should be greatly relaxed when applied to the initiation of a valid claim to unsurveyed lands, and that which shows good faith under the particular circumstances should be sufficient.

In *Nelson v. Northern Pac. R. Co.*, 188 U. S. 108, a case somewhat akin to this, Mr. Justice Harlan discusses the occupancy of unsurveyed lands, and though in that case the settler actually resided on the land in dispute, the spirit of the decision seems to lend support to our view as above indicated. We think the case of *Great Northern R. Co. v. Hower*, 236 U. S. 702, distinguishable upon the facts, and therefore not con-

trolling upon this point. Still, as this question is not free from doubt, we may well inquire into the right of the railway company to select this land after an adverse claim, valid or invalid, has been instituted.

Tincker had, in fact, claimed the land prior to the selection by the railway company. His claim was clearly evidenced on the land by his posted notices and improvements. Had the railway company caused a careful investigation to be made, such as the law contemplates, it must have been advised of Tincker's claim, and could not then have truthfully asserted that "no adverse right or claim" had attached. We say could not, because the language of the act is significant of its purpose. An "adverse right" indicates and describes a valid and subsisting claim, while the addition of the words "or claim" indicates something less, and we think is broad enough to include a claim of any nature. Manifestly it was not the intention of Congress to constitute the railway company the judge of what claims were valid and what invalid, and therefore it extended to the railway company the right to select only those lands over which there could be no controversy.

Surely, if the railway company had disclosed to the land department the true facts then existing, i. e., that, at the very time its list was filed, Tincker was upon the land in person, engaged in cutting trails, building a cabin, and the like, with the intention of claiming it as a homestead, its selection would not have been approved, even though it further appeared that thereafter Tincker had not followed up his initiatory acts by making the land his home to the exclusion of one elsewhere. At the most we think, under these circumstances, the railway company might have been permitted to show the abandonment by Tincker, and that would have required a hearing to which Tincker

must have been a party. But even this may well be doubted. In *Kansas Pac. R. Co. v. Dunmeyer,* 113 U. S. 629, it is said:

"It is not conceivable that Congress intended to place these parties as contestants for the land, with the right in each to require proof from the other of complete performance of its obligation. Least of all is to be supposed that it was intended to raise up, in antagonism to all the actual settlers on the soil, whom it had invited to its occupation, this great corporation, with an interest to defeat their claims, and to come between them and the government as to the performance of their obligations.

"The reasonable purpose of the government undoubtedly is that which it expressed, namely, while we are giving liberally to the railroad company, we do not give any lands we have already sold, or to which, according to our laws, we have permitted a pre-emption or homestead right to attach. No right to such land passes by this grant."

In the case of *St. Paul, M. & M. R. Co. v. Donohue,* 210 U. S. 21, speaking of a situation similar to the one now under consideration, where the claimant was in possession when the railway company filed its list, which list was, by reason thereof, rejected or suspended, and thereafter the claimant relinquished, and it was thereupon contended that, upon the filing of the relinquishment, the railway company's suspended selection should attach, it was said:

"When the selection and supplementary selection of the railway company was made the land was segregated from the public domain and was not subject to entry by the railway company." Citing cases.

And those words, we think, are equally applicable here. See, also, *Hastings & D. R. Co. v. Whitney,* 132 U. S. 357; *Whitney v. Taylor,* 158 U. S. 85; *Northern Pac. R. Co. v. Trodick,* 221 U. S. 208, and *United States v. Great Northern R. Co.,* 254 Fed. 522.

Many other points are raised, some of which, in view of the conclusions already reached, it is unnecessary to discuss or decide. Others, apparently, are advanced with less seriousness. In view of our holding that a claim had attached prior to the filing of the railway company's list, that the attaching of that claim withdrew the land from the purview of the act under which the railway company claims, and its selection was, therefore, ineffectual for any purpose; that the subsequent default, if there was default, on the part of Tincker and Smithey, did not inure to the benefit of the railway company; and that, therefore, the land was open and subject to homestead claim when Reed actually settled thereon, and when he made entry therefor, we deem these points not well taken and not of sufficient importance to warrant further prolongation of this opinion.

For the reasons given the judgment is affirmed.

MAIN, C. J., HOLCOMB, and PARKER, JJ., concur.

### ON REHEARING.

[*En Banc.* February 15, 1924.]

PER CURIAM.—Upon a rehearing *En Banc,* a majority of the court adhere to the opinion heretofore filed herein, and for the reasons therein given, the judgment is affirmed.